The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman and the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the holding of the Deputy Commissioner. The Full Commission enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 10 March 1999 as:
 STIPULATIONS
1. The employee is Mary Brown.
2. The employer is High Point Regional Hospital.
3. The servicing agent is Alexis, Inc.
4. At all relevant times, an employer-employee relationship existed between the defendant-employer and the employee, defendant-employer regularly employed three or more employees, and defendant was bound by the North Carolina Workers' Compensation Act.
5. A Form 22 stipulated to by the parties indicates an average weekly wage of $240.00 yielding a compensation rate of $160.00.
6. A Form 21 was signed by the parties and approved by the Industrial Commission on October 6, 1994.
7. Compensation due to plaintiff until December 4, 1994 was paid by defendant.
In addition, the parties stipulated into evidence the following:
1. Indexed packet of Industrial Commission forms.
2. Medical records from Dr. Wilson submitted February 10, 2000.
 The Pre-Trial Agreement dated March 10, 1999 is incorporated by reference.
 ***********
Based upon the entire evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff has an eighth grade education and began working for defendant hospital in March 1994 as a housekeeper. She had previously worked for other employers in a similar capacity. Her primary job duties included cleaning patients' rooms and emptying trash.
2. In July and August 1994 plaintiff missed approximately one month of work due to severe depression. She was admitted to Charter Hospital on July 11, 1994 and was treated by Dr. Reddy until her discharge on July 28, 1994. Her diagnoses included major depression, severe alcohol dependence and dependent personality traits with mild mental retardation. Dr. Reddy treated her with medication, but after her discharge she was less than compliant with his instructions regarding her medicines because she could not afford the prescriptions. Consequently, she was given samples from the doctor's office.
3. Plaintiff returned to work in August with the encouragement of Dr. Reddy who considered work to be therapeutic. However, on September 3, 1994 she sustained a compensable injury at work. She experienced pain in her back while reaching for paper towels to put on her cart. Later that day, while pushing a vacuum cleaner, she had a sharp pain in her back that prevented her from working further. After she reported her injury, she was sent to the emergency room for treatment. Apparently plaintiff then scheduled an appointment with Dr. Dalldorf, an orthopedic surgeon, without obtaining approval from her employer. Dr. Dalldorf examined her on September 15, 1994 for complaints of low back pain with some radiation into her legs. He diagnosed her condition as an acute lumbosacral strain, prescribed medication and physical therapy, and advised her not to work for two weeks.
4. Defendant, who admitted liability for benefits for plaintiff's injury under the Workers' Compensation Act pursuant to a Form 21 agreement, then instructed her to go to the Occupational Health Clinic for further treatment. She was treated there for a short time but was then referred to Dr. Warburton, another orthopedic surgeon. Dr. Warburton saw her on September 30 and noted that she smelled of alcohol. He ordered an MRI. The test indicated that there was a small central herniated disc at L4-5, so he decided to refer her to Dr. Schwarz, a neurosurgeon, for evaluation. Dr. Schwarz then examined her on October 17, 1994. However, he found it very difficult to get a good description of her symptoms from her and she advised him that she had pain and numbness in whatever body parts he asked her about. She was also difficult to examine because of breakaway weakness in all muscle groups. In addition, he noted inconsistencies between her movements in the examining room and those in the hallway when she was leaving.
5. Dr. Schwarz reviewed the MRI, which did not show significant thecal sac or nerve root involvement, and advised that plaintiff would not require surgery. He recommended physical therapy and an epidural steroid injection. Plaintiff declined the injection but did attend physical therapy. When she next saw Dr. Schwarz on October 31, he again noted inconsistent behaviors. The physical therapist had also reported that plaintiff had demonstrated non-organic signs and non-physiological behaviors and had completed an inappropriate pain drawing. Dr. Schwarz ordered two more weeks of physical therapy, but the physical therapist subsequently advised him that plaintiff was not making a consistent, reliable effort at therapy. On November 14, 1994 Dr. Schwarz released her from his care and left decisions regarding her ability to work to her psychiatrist. By letter dated December 4, 1994 he further explained that plaintiff had no disability associated with her back condition, but he considered her psychiatric condition to be potentially job-limiting.
6. Plaintiff had continued to see Dr. Reddy periodically regarding her preexisting depression since her discharge from Charter Hospital. However, by December 1994 he indicated that she was stable enough to return to work and he advised her to try.
7. After plaintiff was released to return to work, her supervisors contacted her to let her know that she could return to work. Chris Coble, the second line supervisor, made arrangements so that she would not have to vacuum or work on hard floors. He spoke to her in December, as did Rachel Hill, the morning supervisor, who was chronically short staffed and who called plaintiff almost every day to ask if she would come in to work. There were a couple of occasions where plaintiff said that she would come in the next day, but she never reported for work. Consequently, in March 1995 her employment was terminated.
8. Defendant filed a Form 24 request to stop payment with the Industrial Commission in December 1994 which was approved over plaintiff's objection by order filed January 27, 1995.
9. On February 14, 1995 plaintiff returned to Dr. Reddy and expressed considerable anger that she had not been placed on disability. Dr. Reddy advised her to get a second opinion, not necessarily to get disability but to get treatment if she needed it. Plaintiff then saw Dr. Paul, an orthopedic surgeon. There were inconsistent findings on his examination. Although his findings were inconclusive and he thought that she might be malingering, he recommended that she undergo a myelogram/CT scan to see if there was any evidence of nerve root compression. Consequently, the tests were performed on October 10, 1995, but there was no evidence of neural encroachment. However, Dr. Paul then wanted her to have a discogram. That test was apparently not authorized and was not performed. Despite the lack of objective evidence of nerve root irritation, in response to correspondence from plaintiff's counsel, Dr. Paul recommended work restrictions.
10. In November 1996 defendant sent plaintiff back to Dr. Schwarz for evaluation. On that occasion, she was more cooperative with the examination and the findings were within normal limits. Dr. Schwarz found nothing to warrant work restrictions.
11. Plaintiff next saw Dr. Warburton on March 17, 1998. She had reported to him that she had seen Dr. Schwarz and had sought treatment from a chiropractor and another doctor but that she continued to have low back pain radiating into her left leg. A recent CT scan had revealed a central disc herniation at the same level. Dr. Warburton recommended another neurosurgical evaluation, so plaintiff was again seen by Dr. Schwarz on April 2 and 7, 1998. After reviewing the films, Dr. Schwarz determined that she had a very mild, defuse disc bulge that did not touch the thecal sac or nerve roots. She had no specific neurological findings or any change of condition which would justify work restrictions, however, he believed that she had other issues which could be addressed at a pain management program and he recommended that she be evaluated at a facility in High Point.
12. In April 1999 Dr. Warburton sent plaintiff to Dr. Wilson, a neurosurgeon at Baptist Hospital. Dr. Wilson examined her on May 13, 1999. He reviewed an MRI that had been taken in March 1999. In his opinion, the very small right-sided disc herniation shown on the test had no significance with respect to her complaints. He did not recommend surgery or medical treatment and did not restrict her work activities. When Dr. Schwarz subsequently reviewed the radiology report regarding that MRI in his deposition and read that the herniation appeared larger than on the previous MRI, he contemplated that work restrictions might be appropriate. However, he had not seen plaintiff in over a year at the time of his deposition, so he did not have her current findings, unlike Dr. Wilson.
13. Defendant paid compensation to plaintiff for temporary total disability until December 4, 1994 pursuant to the Form 21 agreement approved in this case. The Industrial Commission allowed defendant to stop payment of compensation effective December 5, 1994. Plaintiff filed a motion to reconsider the Administrative Decision and Order that had been filed on January 27, 1995. The motion was denied by Order filed February 28, 1995. Consequently, defendant paid no further compensation to plaintiff in the case.
14. As of December 5, 1994 plaintiff was capable of performing her regular job as a housekeeper for defendant without restrictions. Defendant, however, offered to provide work to her that was less strenuous than normal. Plaintiff refused to return to work without justification for three months. Defendant then terminated her employment for good cause. She thereafter made no effort to find work.
15. Plaintiff's reported symptoms were inconsistent with and out of portion to her objective findings. She also presented herself much differently in the doctor's examining room than she acted elsewhere when unaware that she was being observed. Although she has pointed to psychological testing which indicated that she had mild mental retardation and that she could only read at the second grade level, she demonstrated a higher performance level at the hearing and in written notes contained in the record. Consequently, it appeared that the test results had been affected by her emotional state at the time of testing. Furthermore, her alcohol dependence was probably a factor throughout the time following her injury.
16. Dr. Paul's opinions have been given less weight than those of Dr. Schwarz and Dr. Wilson in part because of the described problems with plaintiff's credibility.
17. Plaintiff reached maximum medical improvement with respect to her back injury by December 1994 with no permanent disability.
18. During the two years following the last payment of compensation, plaintiff did not sustain a material change for the worse in her condition. She remained able to perform her regular job duties and her medical condition did not change.
19. The psychiatric illnesses for which plaintiff was treated by Dr. Reddy were not causally related to her injury at work. Rather, they preexisted the injury.
20. No findings are made regarding plaintiff's average weekly wage since a Form 21 agreement was approved in the case, there has been no showing of fraud, mutual mistake, undue influence or misrepresentation, the parties stipulated to the amount shown on the Form 21 agreement and no issue was raised in the Pre-Trial Agreement.
21. Defendants defended this claim with reasonable grounds.
22. In view of plaintiff's clouded medical picture and the difficulty encountered by her physicians in properly assessing her status, and in view of the four years without a material change of condition, plaintiff has not established that her application for future medical treatment should be approved.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. In that plaintiff was capable of performing her regular job duties as of December 5, 1994 and defendant offered her suitable work, the Form 24 request to stop payment was properly granted. Plaintiff is entitled to no additional compensation for temporary total disability. G.S. § 97-29; Anderson v. Northwestern Motor Company, 233 N.C. 372
(1951).
2. In that plaintiff reached maximum medical improvement by December 1994 with no permanent partial disability, the compensation paid for temporary total disability was her final compensation under the terms of the award for compensation. She sustained no material change for the worse in her condition during the next two years or even up to the date of hearing and therefore is not entitled to further compensation of any nature arising from this claim. G.S. § 97-47.
3. Plaintiff is not entitled to future medical compensation. G.S. § 97-25.1.
4. Plaintiff is not entitled to have attorney's fees assessed against defendant. G.S. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Plaintiff's claim for additional workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs.
IT IS FURTHERMORE ORDERED that no medical treatment not previously authorized by defendant is authorized by this decision.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER